FILED
00 DEC -4 PM 2:10
U.S. DISTRICT COURT
N.D. OF ALABAMA

ENTERED
DEC - 4 2000

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| DEBRA CLEMONS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) Civil Action No. |
| v. | ) |
| | ) 99-AR-1412-S |
| | ) |
| CHILDREN'S HEALTH SYSTEM, | ) |
| | ) |
| Defendant. | ) |

### MEMORANDUM OPINION

Presently before the court is defendant's motion for summary judgment. Plaintiff, Debra Clemons ("Clemons"), alleges that defendant, Children's Health System ("CHS"), violated Title VII and state law when her supervisor at CHS sexually harassed her and when she suffered retaliation. CHS seeks summary judgment as to all counts of Clemons's complaint. For the reasons set forth in the opinion below, CHS's motion is due to be granted as to Clemons's state law claims and denied as to her claims of sexual discrimination and retaliation.

### Pertinent Material Facts

The court finds the following facts to be relevant to its grant of summary judgment of Clemons's state law claims. Clemons worked as a secretary in CHS's Information Systems (IS) Division.

Her supervisor during the period of the alleged harassment was Jack Davis ("Davis"), who was then employed by CHS as Director of the IS Division. Clemons bases her claims of sexual discrimination on three instances of sexual harassment by Davis. The first alleged instance occurred in May, 1998 when Davis and Clemons were driving back to work from lunch and Davis placed his hand on Clemons's knee. This surprised Clemons; within a matter of seconds she pushed it off. After returning to work, Clemons told a colleague also under the supervision of Davis, Pam Atkins ("Atkins"), about the incident. Atkins had no supervisory authority over Clemons.

The second incident occurred sometime later in May, 1998. As she routinely did, Clemons entered Davis's office to deliver his mail. Davis closed the door behind Clemons and allegedly tried to forcibly hug her. She forcibly broke the hug and verbally protested the physical contact. Clemons told Atkins about this event on or about June 1, 1998 when Clemons also recounted the third incident, which occurred at Davis's annual evaluation of Clemons on June 1, 1998. These evaluations were used to generally review employee performance and to set employee salary. Near the beginning of the meeting, which was held over breakfast at an Arby's restaurant, Davis told Clemons that he had a dream about her in which they were in bed together and he had his hand on her

2

breasts. Although she says that she was stunned by this revelation, Clemons's outward reaction was apparently minimal, and the evaluation began. At some point during the evaluation, Davis also told Clemons that he would see what he could do for her in obtaining a raise for her more than the 2 or 3 percent that he believed might have been the maximum allowable. Clemons testifies that the evaluation was lacking in substance and incomplete, but that Davis told her it was of the best evaluations he had ever given. The evaluation was never formally completed.

On or about June 1, 1998, a visibly upset Clemons reported the second and third incidents to Atkins. According to Atkins, Clemons seemed upset in part due to the small size of her salary increase. Davis also recounts that Clemons seemed angry the day following the evaluation.

Clemons had previously received CHS's sexual harassment policy. In part, it explains what constitutes a violation and specifies that the responsibility to report suspected instances of sexual harassment falls on the harassed individual and on any witness to the harassment. It directs employees to report suspected harassment to their supervisor or division manager. When the harasser is a supervisor, employees are told to contact the Human Resources Department.

"[A] few days" after Clemons told her about the second and third incidents, Atkins contacted Kim Singleton ("Singleton"), who at the time was Manager of Human Resources for CHS, to report what Clemons had told her. Davis left the office for vacation around mid-day on June 3, 1998 and was not due to return until Monday, June 15, 1998. As a result of Atkins's contact with Singleton, Clemons, Atkins, Singleton, and Mike McDevitt ("McDevitt"), CHS's Chief Technology Officer and Davis's supervisor, met on June 8, 1998. Clemons then reported the incidents directly to Singleton and McDevitt. In response, Singleton and McDevitt planned to investigate the matter further by meeting with Davis upon his return. At the June 8th meeting they also granted Clemons paid administrative leave on June 15th and 16th, so that she would not have to be in the office with Davis while the matter remained unresolved.

Davis did return to the IS office on June 15th, and Singleton and McDevitt met with him that afternoon to get his response to Clemons's allegations. With some variation, Davis in substance admitted to the three acts. Singleton and McDevitt concluded that although Davis's behavior did not rise to the level of sexual harassment, it was totally inappropriate. On the basis of this conclusion, they fired Davis but immediately made him an

independent contractor. In his new "position", he still worked on matters related to the CHS Information System, but his office was moved to another building. In addition, as conditions to his contract, he was forbidden from entering the building that housed the IS offices and was to avoid any contact whatsoever with Clemons.

Following the June 16, 1998 meeting with Davis, Singleton and Atkins made attempts to contact Clemons, who had not returned to work after her June 15th-16th administrative leave. When Clemons reported to Atkins that she had seen a doctor and that he had told her not to return to work, she was advised to pick up a Family Medical Leave Act (FMLA) form from the hospital. At some point, she was also informed that she could not return to work until she had (1) returned a completed FMLA form signed by her doctor, (2) submitted a release to return to work from her doctor, and (3) indicated whether the steps CHS had taken in regard to Davis were sufficient.

In response, Clemons returned the FMLA form that was complete, except for the first item, which asks the treating physician to indicate under which category, if any, the patient's condition qualifies under the FMLA. A separate form provides the FMLA medical condition categories. Singleton testifies that this

5

separate form was given to Clemons, but Clemons does not remember receiving it.

Clemons was released from her doctor's care on July 8, 1998. The care for stress and stress-related conditions, such as anxiety and depression, had begun on June 16, 1998. At some point, she returned to CHS a release form that was signed and dated by her doctor July 7, 1998; however, it failed to indicate whether he placed any restrictions on her duties. On July 14th, she returned a second, completed release form that indicated that her doctor placed no restrictions on what she could do at work. Still, some question remained as to the issue of restrictions because of a contradiction between the FMLA form and the release form.

As to the sufficiency of the steps CHS had taken with Davis, when that issue was put to her during a July 16th meeting with Singleton and McDevitt, Clemons was, by turns, either non-responsive or clear that she wanted to return to work.

The purpose of the July 16th meeting was to examine the issue of whether Clemons would return to work. In the meeting, Singleton and McDevitt requested that by July 20th Clemons clear up outstanding issues concerning the FMLA form, the release form, and her stance on CHS's steps in regard to Davis. Receiving no response, Singleton sent a letter dated July 23rd to Clemons

6

restating the three requirements for her return to work. Clemons's lack of response to these requests were the grounds given in Clemons's termination letter dated July 30, 1998.

On July 9, 1998, Clemons made out an EEOC complaint. It was filed on July 10, 1998. In it she alleged that CHS had retaliated against her in violation of Title VII. A later charge incorporating the events surrounding her termination was filed with the EEOC on August 13, 1998. CHS did not become aware of the original charge until September 22, 1998. Why it took the EEOC over two months to let CHS know that it was an employment discrimination target is unexplained.

In her complaint, Clemons bases her retaliation claim on "unequal treatment regarding job assignments, compensation, leave without pay, termination, and other terms, conditions, and privileges of her employment."

### Summary Judgment Standard

Rule 56(c), F.R.Civ.P. provides that summary judgment shall be granted if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The

Supreme Court has emphasized that this language means exactly what it says: there must be a <u>genuine</u> issue of <u>material</u> fact, not merely some factual dispute.  See *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-248, 106 S.Ct. 2505, 2510 (1986). What this standard means in practice is that "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson*, 477 U.S. at 249, 106 S.Ct. at 2511 (citing *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 88 S.Ct. 1575 (1968)).

On defendant's motion for summary judgment, the court must look at the evidence, construed in plaintiff's favor, to see if a reasonable jury could return a verdict for plaintiff. If so, defendants' motion for summary judgment must be denied. If, however, as a matter of law, a jury could not return a verdict for plaintiff, defendant's motion must be granted.

### State Law Claims

CHS's motion for summary judgment is due to be granted as to Clemon's state law claims. Under Alabama law, if the acts of an agent, servant, or employee violate the law, the employer can be held liable for that person's wrongful acts in only three

circumstances: (1) the employer participated in, authorized, or ratified the acts; (2) the acts were done in furtherance of the employer's business interests; or (3) the acts were performed within the line and scope of the employee's job. *See Potts v. BE&K Construction*, 604 So.2d 398, 400 (Ala. 1992) (quoting *Joyner v. AAA Cooper Transportation*, 477 So.2d 364, 365 (Ala. 1985)). Clemons claims that Davis's conduct constitutes assault, battery, invasion of privacy, and intentional infliction of emotional harm (outrage) and that CHS ratified this conduct. In addition, Clemons claims that CHS is liable for the torts of outrage, negligent training, and negligent supervision.[1] Presumably, she would attach liability under these counts using one or both of the theories for employer liability other than ratification.

### A. CHS's Liability Based on Acts of Ratification[2]

A charge of employer ratification requires first that the underlying conduct by the offending employee be proven tortious. Then, the "complaining employee must show that the employer (1) had

---

[1] No argument supporting these allegations is made in plaintiff's brief in opposition to defendant's motion for summary judgment.

[2] In her complaint, Clemons specifies in Count VIII that there was ratification via negligent supervision. This specification changes neither the facts nor the legal analysis relevant to determining whether CHS, in any way, ratified Davis's behavior.

9

actual knowledge of the tortious conduct of the offending employee and that the tortious conduct was directed at and visited upon the complaining employee; (2) that based upon this knowledge, the employer knew, or should have known, that such conduct constituted sexual harassment and/or a continuing tort; and (3) that the employer failed to take 'adequate' steps to remedy the situation." *Potts*, 604 So.2d at 400; see *Ex Parte Atmore Community Hospital*, 719 So.2d 1190, 1195 (Ala. 1998). If the tortious conduct stops after the employer acts on its knowledge, then the steps taken are adequate as a matter of Alabama law. See *Atmore Community Hospital*, 719 So.2d at 1195 (citing *Potts*, 604 So.2d at 401). Even if the tortious conduct continues after the steps are taken, the employer's measures are inadequate only if they are not "reasonably calculated to stop the [conduct]." *Potts*, 604 So.2d at 401; see *Atmore Community Hospital*, 719 So.2d at 1195.

Assuming arguendo that Davis's acts did amount to assault, battery, invasion of privacy, and/or outrageous conduct, Clemons cannot show that CHS ratified Davis's behavior because the undisputed facts show that CHS took adequate steps to remedy the situation. First, the court notes that Atkins's knowledge of the harassment cannot be imputed to CHS. Under CHS's sexual harassment

policy, employees have a responsibility to report harassment if they are the subject of the offensive behavior or if they witness it. Atkins witnessed none of the alleged behavior, and she was a co-worker of Clemons, not a supervisor. Moreover, defendant has not presented any Alabama authority on the issue of ratification which stands for the proposition that, despite such a policy, when an employee tells a co-worker about being subject to sexual harassment, the co-worker's knowledge should be imputed to the employer. Merely by sharing the information with Atkins, Clemons did not transform their relationship from colleague-colleague to master-servant. Therefore, under Alabama law, CHS did not receive actual or constructive knowledge until Atkins contacted Singleton, a CHS employee who did have the authority to remedy the situation.

From the time that Singleton was notified by Atkins of the conduct complained of, Clemons was not subject to any allegedly tortious conduct. At least in part, this was a circumstance beyond the control of CHS: it received notice at the earliest on June 3, 1998, Davis was on vacation beginning on June 3rd and returned on June 15, 1998 and Clemons never returned to work after her administrative leave ended on June 16, 1998. However, CHS's measures did play a part in preventing further contact between Davis and Clemons. In their first discussion with Clemons on June

11

8th, Singleton and McDevitt granted her paid leave for the first two days of Davis's return from vacation. This measure was designed to and did in fact help prevent any further tortious conduct, if only on June 15th. It is equally clear that the same could be said as to June 16th had Clemons not entered a doctor's care on that day.

Furthermore, Clemons has produced no evidence to suggest that Singleton's and McDevitt's other actions, taken on June 15 and June 16, 1998, were not reasonably calculated to prevent further tortious conduct. Their apparent reasoning for giving Clemons June 15th and 16th off was that within those two days they would be able to meet with Davis and then consider an appropriate course of action. This they did. Davis returned to work on June 15th; Singleton and McDevitt met with him that afternoon. On June 16th CHS fired Davis and offered to hire him as an independent consultant, with certain conditions, including relocation of his office to another building and avoidance of Clemons and the IS department as long as she was employed there. While ultimate proof of the effectiveness of these measures was precluded by the fact that Clemons never returned to work, this circumstance does not also preclude a finding that these steps were adequate under Alabama law. In light of the effectiveness of granting Clemons administrative leave for June 15th and 16th, the court finds that CHS's actions on June 15th and the measures CHS forced Davis to

accept on June 16th as a condition of maintaining an independent contractual relationship with the hospital were reasonably calculated to remedy the situation. Therefore, like the step taken on June 8th, the measures taken on June 16th are sufficient under Alabama law.

### B.  CHS's Liability Based Acts Done within the Scope of Employment and/or in Furtherance of Its Business Interests

Apart from CHS's acts of alleged ratification, Clemons says that CHS is liable under state law for outrage, negligent supervision, and negligent training. Apparently, she would base liability for these counts on acts by CHS employees that were done to advance the business of CHS and/or done within the line and scope of their employment. The court does not reach the applicability of these theories because it finds that Clemons cannot pass the threshold requirement of proving that the underlying employee conduct was wrongful under state law.

1. <u>Outrageous Conduct</u>

Under Alabama law, to prove outrageous conduct a plaintiff must show "(1) that the defendant either intended to inflict emotional distress, or knew or should have known that emotional

13

distress was likely to result from its conduct; (2) that the defendant's conduct was extreme and outrageous; and (3) that the defendant's conduct caused emotional distress so severe that no reasonable person could be expected to endure it." *Jackson v. Alabama Power Co.*, 630 So.2d 439, 440 (Ala. 1993) (citing *American Road Service. Co. v. Inmon*, 349 So.2d 361, (Ala. 1981)). Regarding the substance of the second of these requirements, the Supreme Court of Alabama has indicated that "[b]y extreme we refer to conduct so outrageous in character and so extreme in degree as to go beyond all possible bounds of common decency." *American Road Service. Co.*, 349 So.2d at 365. The tort in general is a limited remedy used only in egregious circumstances. *See Thomas v. BSE Indus. Contractors, Inc.*, 624 So.2d 1041, 1044 (Ala. 1993); *Kelley v. Worley*, 29 F.Supp.2d 1304, 1312-1313 (M.D. Ala. 1998).

Clemons has not produced evidence that could lead a reasonable trier-of-fact to conclude that any behavior that can be attributed to CHS was sufficiently outrageous and extreme. As discussed above, CHS did not ratify any of Davis's behavior, and Clemons concedes in her brief that his conduct was not done in furtherance of business interests or within the scope of his employment. *See Pl.'s Mem. of Law in Opp'n to Def.'s Mot. for Summ. J.* at 25-26.

14

For state law purposes, the only other CHS employees whose conduct may have any possible legal relevance are Atkins, Singleton, and McDevitt. Even if their acts give rise to liability on the retaliation and sexual discrimination counts under the analytical framework established by the United States Supreme Court and interpreted by the Eleventh Circuit, it is something entirely different to say that they also give rise to liability based on the tort of outrage as announced in Alabama courts. The latter issue presents a higher bar to clear for defendant. There are no facts presented that could support the contention that the alleged acts of Atkins, Singleton, and McDevitt cross the "bounds of common decency."

2. <u>Negligent Supervision and Training</u>

In a master-servant relationship, such as existed between CHS and Davis, to establish liability based on negligent supervision and/or training, Clemons must show "specific acts of incompetency and show[] that they were brought to the knowledge of the master or [that the acts were] of such a nature, character, and frequency that the master, in the exercise of due care, must have had notice of them." *Mardis v. Robbins Tire & Rubber Co.*, 669 So.2d 885, 889

(Ala. 1995); see *Machen v. Childersburg Bancorporation. Inc.*, 761 So.2d 981, 986-87 (Ala. 1999); *Kelley*, 29 F.Supp.2d at 1313-1314.

Clemons claims that CHS was negligent both in preventing Davis's conduct and preventing further similar behavior once it began. Although there are vague statements in the record to the effect that Davis was considered flirtatious and at times told jokes not suitable for children, defendant does not present any "specific acts" that predate the first of the three incidents of alleged harassment. Moreover, these three occurrences are not of such a "nature, character, and frequency" to support a finding that they put CHS on constructive notice. *See Mardis,* 669 So.2d at 890 (finding failure to report alleged incompetency before last date of employment fatal to negligent training and supervision claim); *Kelley*, 29 F.Supp.2d at 1313 (holding that five acts which included explicitly demanding sexual acts in return for continued employment and several instances of rubbing plaintiff's legs, breasts, and buttocks were not enough to put the employer on constructive notice).

Once CHS had actual notice, it wasted little time in investigating and acting. Singleton and McDevitt met with Clemons on June 8, 1998 and then with Davis upon his return from vacation.

16

The following day, CHS changed Davis's status from an employee to an independent contractor. At the same time, it conditioned this new relationship on Davis avoiding contact with Clemons and avoiding the IS department as long as she worked there. Under Alabama law, these actions decisively distinguish this case from those where the issue has gone to a jury based on the fact that the employer failed to undertake a full investigation upon receiving actual notice. *See, e.g., Machen*, 761 So.2d at 986-87 (finding that no measures were taken against the offending employee aside from an oral reprimand and that no written report made); *Big B, Inc. v. Cottingham*, 634 So.2d 999, 1002-1004 (Ala. 1993) (finding that the employer did not interview the complaining employee or make a written report).

### **Federal Sex Discrimination Claim**

As stated, the court must give the non-movant the benefit of the doubt for summary judgment purposes and resolve all reasonable factual disputes in her favor. Given this approach and the factually-intensive nature of the inquiry set forth in *Faragher v. City of Boca Raton*, 524 U.S. 775, 780, 807-08, 118 S.Ct. 2275, 2280, 2292-2293 (1998) and *Burlington Industries, Inc. v. Ellerth*,

524 U.S. 742, 753-54, 764-65, 118 S.Ct. 2257, 2265, 2270 (1998) for determining whether an employer can be vicariously liable for the alleged sexual harassment by a supervisor-employee against a subordinate, this court cannot conclude that as a matter of law Davis's actions toward Clemons cannot give rise to liability on the part of CHS.

### Retaliation Claim

A *prima facie* claim of retaliation is made out by showing that: (1) plaintiff engaged in a statutorily protected activity; (2) plaintiff suffered an adverse employment action; and (3) a causal connection exists between the protected activity and the adverse action. *See Taylor v. Runyon*, 175 F.3d 861, 868 (11th Cir. 1999)(citation omitted). When a *prima facie* case is established, if a defendant can show a legitimate, non-discriminatory reason for the employment action, then the plaintiff has the burden of showing that defendant's proffered reason for the employment decision is merely a pretext. *See id*.

In its briefs in support of summary judgment, CHS bases its argument against Clemons's retaliation claim on the assertion that Clemons has restricted the basis of that claim to the allegation

that CHS fired her for filing the original EEOC charge on July 10, 1998. *See Def.'s Mem. of Law in Supp. of Mot. for Summ. J.* at 46-51.  In support of this contention, CHS presents excerpts from Clemons's deposition.  In one exchange, Clemons affirmatively answers the question "[T]he sole basis of your retaliation claim was is [sic] that you claim because you filed this EEOC charge, [CHS] started treating you differently after you filed the charge and [CHS] terminated you because of the charge; is that correct?" *Pl.'s Dep.* at 225: 6-13.  While this exchange and others plainly support CHS's claim, other replies by Clemons on the subject obfuscate that assertion.  She twice indicates that she bases the retaliation claim at least in part on conduct that predates the filing of her EEOC charge.  *See Pl.'s Dep.* at 220: 2-8, 15-17. Although there are indications that the questioner thought, rightly or wrongly, that she was confusing the basis of her sexual discrimination claim with the basis of her retaliation claim, it is certainly possible that she contends that there is some factual overlap between the two claims.  This contention would be consistent with the allegations of retaliation made in her original EEOC charge, which was filed approximately three weeks before her termination, in her complaint, and in her brief.

Under these circumstances, the court is not prepared at this stage to limit Clemons's retaliation claim to the assertion that all of the allegedly retaliatory conduct stems from her filing of the original EEOC charge. Given this starting point, the court finds that genuine issues of material fact remain as to whether plaintiff suffered retaliation for statutorily protected activity.

### Conclusion

A separate and appropriate order will be entered.

DONE this 4<sup>t</sup> day of December, 2000.

WILLIAM M. ACKER, JR.
UNITED STATES DISTRICT JUDGE